UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| Michael J. Sicinski and <br> Jennifer L. Wingard, <br>     Plaintiffs, <br><br> v. <br><br> Dovenmuehle Mortgage, Inc.; and DOES <br> 1 through 100 inclusive, <br>     Defendants. | § § § § § § § § § § § § CASE NO. 4:22-cv-02967 |

  COMES NOW Plaintiffs **MICHAEL J. SICINSKI** ("Mr. Sicinski") and **JENNIFER L. WINGARD** ("Mrs. Wingard"), collectively known as the "Plaintiffs", individuals, based on information and beliefs, to allege as follows:

### INTRODUCTION

  1. This case arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681s-2(b). Plaintiffs seek redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of the Plaintiff's debt.

  2. Defendant Dovenmuehle Mortgage, Inc. ("Dovenmuehle") serviced Plaintiffs' mortgage which was held by Cherry Creek Mortgage, LLC ("Cherry Creek"). Dovenmuehle's servicing of the mortgage included reporting to the credit reporting agencies.

  3. Dovenmuehle is inaccurately reporting that Mr. Sicinski's and Mrs. Wingard's account was discharged in bankruptcy. In addition, Dovenmuehle is inaccurately and incompletely reporting the payment history of the account on Mr. Sicinski's Experian report and on Mrs. Wingard's Equifax and Experian reports.

  4. The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system and unfair credit reporting methods undermine the public confidence that is essential to the continued functioning of the banking system.

  5. A pervasive and fundamental misunderstanding presently thrives in the United States regarding the long-term impact that filing a consumer bankruptcy has on the consumer's creditworthiness. Specifically, consumers tend to believe that since a bankruptcy can be reported

on their credit report for ten (10) years, their creditworthiness will be ruined for the same length of time. This is not true.

6. The *majority* of consumer debtors file a consumer bankruptcy to *raise* their FICO Score and remedy their poor creditworthiness.

7. In fact, it is possible for consumer debtors to obtain a 700 FICO Score as soon as twelve (12) months from filing a consumer bankruptcy (Chapter 7 or Chapter 13).

8. Creditors and lending institutions are aware of the misconception that filing a consumer bankruptcy destroys the consumer's creditworthiness of ten (10) years; however, to perpetrate this bankruptcy myth, creditors intentionally and routinely ignore industry standards for accurately reporting bankruptcies, as well as the debts included in those bankruptcies, to keep consumers' credit scores low and their interest rates high.

9. Creditors know that deviating from recognized credit reporting standards will make it difficult for consumers to raise their credit scores and improve their creditworthiness.

10. This was not the intent of Congress when it enacted the Fair Credit Reporting Act and the Bankruptcy Abuse Prevention and Consumer Protection Act.

## JURISDICTION & VENUE

11. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

12. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, and 15 U.S.C. § 1681.

13. This venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

14. Plaintiff alleges that, for purposes of establishing residency under 28 U.S.C. § 1391(b)(1), each named Defendant conducts sufficient business within the forum state and this Court has personal jurisdiction over Defendants under 28 U.S.C. §§ 1391(c)(2) and 1391(d).

## GENERAL ALLEGATIONS

15. Plaintiffs allege that the Dovenmuehle account was always paid on time, as agreed. Plaintiffs allege that the Dovenmuehle account was to be paid directly from the Plaintiffs, outside of the bankruptcy, pursuant to 11 U.S.C. §§ 1328(a)(1); 1322(b)(5). Plaintiffs allege that the payments Plaintiffs paid directly to Defendant were provided for in the Chapter 13 Plan. Plaintiffs allege they made each and every payment until Dovenmuehle transferred the mortgage to another lender in or about November of 2020.

16. Plaintiffs allege as their mortgage was a debt with a payment horizon which extended beyond the end of the bankruptcy, and as the payments were provided for in the plan, it was exempt from discharge.

17. Despite the fact the Dovenmuehle mortgage has always been paid on time, was exempt from discharge, and was in good standing at the time of the November 2020 transfer, Dovenmuehle is incorrectly reporting that the mortgage was discharged in bankruptcy, and is incompletely and inaccurately reporting payment history.

18. Plaintiffs allege that it is patently incorrect and misleading for a debt which was fully satisfied to be reported on a credit report in a manner that appears it was discharged in bankruptcy.

19. Plaintiffs allege that if a data furnisher decides to report an account, the FCRA requires complete and accurate reporting; therefore, a data furnisher cannot pick and choose which portions of the account to report. If a data furnisher reports an account, then it should report all portions of that account in a manner which complies with the maximum accuracy and completeness standard of the FCRA.

20. Plaintiffs allege that each and every Defendant is familiar with the FCRA requirements and credit reporting industry standards, and subscribes thereto.

21. Plaintiffs allege that each and every Defendant understands that deviation from the FCRA requirements or credit reporting industry standards can, and often does, result in the denial of credit, higher interest rates, and prompts a negative inference that would not be drawn if the data were reported in accordance with the recognized standards.

22. Plaintiffs allege that all of Defendants' actions alleged herein were committed knowingly, intentionally, and in reckless disregard for the FCRA requirements and/or credit reporting industry standards to purposefully undermine Plaintiffs' ability to repair their respective creditworthiness.

23. In the alternative, Plaintiffs allege that each and every Defendants' actions were the result of reckless policies and procedures that inevitably led to inaccurate, misleading, or incomplete credit reporting.

## FACTUAL BACKGROUND

24. Plaintiffs re-allege and incorporate the allegations in each and every paragraph above by reference as if fully stated herein.

**A.     FICO, Inc.**

25. FICO is a leading analytics software company with its principal headquarters in San Jose, California. FICO has over 130 patents related to their analytics and decision management technology and regularly uses mathematical algorithms to predict consumer behavior, including credit risk.

26. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent (90%) of lending decisions.[1]

27. A FICO Score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

28. Base FICO Scores range from 300 to 850, while industry specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

29. Different lenders use different versions of FICO Scores when evaluating a consumer's creditworthiness.

30. There are twenty-eight (28) FICO Scores that are commonly used by lenders.

31. A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

32. The three largest CRAs are Experian Information Solutions, Inc. ("Experian"); Equifax Information Services, LLC ("Equifax"); and TransUnion, LLC ("TransUnion").

33. FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models, or algorithms, are based on the premise that the information provided by the CRAs is accurate and complies with both the FCRA requirements and credit reporting industry standards.

---

[1] While there are other credit scoring models, it is well established that FICO Score is by far the most widely used by lenders, employers, insurance companies, and lessors. See https://www.myfico.com (a website created and operated by Fair Isaac Corporation ("FICO"), "the company that invented the FICO credit score").

34. There are five (5) key factors that a FICO Score considers: (1) payment history; (2) amount of debt; (3) length of credit history; (4) new credit; and (5) credit mix.

35. Each of the five (5) factors is weighted differently by FICO.

36. In other words, thirty-five percent (35%) of a consumer's FICO Score relates to payment history, thirty percent (30%) relates to the amount of debt, fifteen percent (15%) relates to the length of credit history, ten percent (10%) relates to new credit, and the final ten percent (10%) relates to a consumer's credit mix, which is the different types of debts reported.

37. Payment history refers to whether a consumer has paid their bills in the past, on time, late, or missed payments. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. Public record items, such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

38. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

39. Once a delinquent account has been remedied, the longer the account stays current the more a consumer's FICO Score should increase.

40. FICO Scores are entirely dependent upon information provided by data furnishers ("DFs"), such as banks and other financial institutions, to CRAs.

41. The FICO scoring formula treats both Chapter 7 and Chapter 13 Bankruptcies similarly in terms of their impact on one's FICO Score. Specifically, both Chapters have the same level of severity with respect to their FICO Score and FICO uses the filing date, under both Chapters, to determine how long ago the bankruptcy took place.

42. A FICO Score is a summary of your credit report. In simple terms, the FICO Score is calculated by taking the five (5) factors (payment history, amount of debt, length of credit history, new credit, and credit mix) for each account in a credit report and calculating a three digit number for lenders to review. "When you apply for credit, lenders need a fast and consistent way to decide whether or not to loan you money." *See* https://www.myfico.com/credit-education/what-is-a-fico-score. If a lender or employer did look past the FICO Score into a consumer's reports, chances are they either do not understand the tradeline meanings themselves, or, if they do and realize something appears incorrect, they are incapable of recalculating the complex mathematical algorithms in a FICO Score to take the found error into consideration. Therefore, most lenders and

employers do not review individual accounts, just a consumer's FICO Score (or average of FICO Scores) in order to make "quicker decisions". *See id*.

43. Some lenders also use internal scoring models. In these instances, the lenders attempt to produce their own "FICO Score" based upon their internal credit scorecard models. These models are, similar to FICO, based upon algorithms, business rules, codes, etc. and take information reported in the credit reports and assign weights to them in order to assess risk and make determinations as to consumer's creditworthiness. FICO Scores and the scores based off internal models being collectively referred to as "Credit Score".

**B.    e-OSCAR**

44. e-OSCAR is the web-based, Metro 2 compliant system developed by Experian, Equifax, TransUnion, and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

45. When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-OSCAR to the appropriate DF.

46. The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file e.g., "Account Type" "07" (07 in Metro 2 refers to a Charge Account).

47. When a data furnisher reports on a consumer's account as part of its regular reporting, it sends a regular monthly transmission to each CRA.

48. When a data furnisher reports on a consumer's account outside of its regular monthly transmission, it sends an automated universal dataform ("AUD") to each CRA.

49. For clarification, an AUD, or other regular transmission, is sent when the data furnisher initiates reporting on a consumer's account (e.g., opening an account, updating the account each month, closing an account, etc.), whereas an ACDV is how a data furnisher receives a dispute request from the CRAs and how it updates reporting back to the CRAs after its investigation of the matter.

**C.    Bankruptcy Credit Reporting Industry Standards & Consumer Information Indicator**

50. When a consumer files bankruptcy, certain credit reporting industry standards exist.

51. Certain data is regularly expected and calculated by FICO when determining a consumer's creditworthiness.

52. The Consumer Information Indicator ("CII") is a critical field in the format that indicates a special condition that applies to a specific consumer.

53. The CII must be reported on only the consumer to whom the information applies.

54. It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.

55. CII Code "D" indicates that a Chapter 13 petition has been filed and is active, but no discharge has been entered. This is usually translated on a consumer credit report as "Wage Earner Plan" or "WEP" in the "Account Status" portion of a tradeline. Such reporting alerts any potential lender that the account is no longer in a collectable status and is being handled by a Chapter 13 trustee.

56. The CII Code "Q" removes previously reported Bankruptcy Indicator (A through P and Z) or personal Receivership Indicator. This code is used when the bankruptcy case is complete, but the debt was not discharged in the bankruptcy. The Account was not discharged in the bankruptcy pursuant to 11 U.S.C. §1328(a)(1) and 11 U.S.C. § 1322(b)(5).

57. The CII field is a critical field for consumers as it directly relates and impacts a consumer's creditworthiness.

58. The lack of a CII reported makes it appear that a consumer has not addressed outstanding debt obligations through the bankruptcy process.

59. Failure to report the correct CII indicator will prompt those making credit decisions to draw a more negative inference than if the appropriate CII indicator were reported.

60. A consumer's FICO Score is directly related to the date on which a petition is filed and acknowledged.

61. The bankruptcy's impact on a consumer's FICO Score lessens with the passage of time.

**D. Plaintiffs' Bankruptcy Plan was Maintaining Payments; therefore, the Account was Excepted from Discharged Pursuant to 11 U.S.C. § 1322(b)(5) and 11 U.S.C. § 1328(a)(1)**

62. Plaintiffs filed a voluntary petition for Chapter 13 bankruptcy on March 29, 2018, in order to repair their creditworthiness and Credit Scores.

63. The Dovenmuehle account was provided for in the Chapter 13 Plan.

64. The Chapter 13 Plan was confirmed on May 21, 2018.

65. Plaintiff's bankruptcy was discharged on October 15, 2020.

**E.     Mr. Sicinski's Credit Reports Contain Inaccurate Adverse Tradelines, which he Disputed to no Avail**

66. On February 8, 2021, Mr. Sicinski ordered an Equifax credit report and Experian credit report to ensure proper reporting by his creditors (the "February 8 Credit Reports").

67. Mr. Sicinski noticed adverse tradelines in his February 8 Credit Reports, reporting inaccurate, misleading, or incomplete information that did not comply with the FCRA or credit reporting industry standards.

68. Mr. Sicinski then disputed the inaccurate tradeline regarding the account with Dovenmuehle via certified mail to Equifax and Experian on or about July 19, 2021 (the "Mr. Sicinski Dispute Letters 1").

69. Mr. Sicinski's Dispute Letters 1 specifically put Dovenmuehle on notice that, he has made all payments timely, the account was not discharged in bankruptcy, but that his account was inaccurately and incompletely reflecting the payments made in the payment history, and inaccurately reported as discharged.

70. Mr. Sicinski's Dispute Letters 1 also detailed what was perceived to be problematic about the Dovenmuehle account reporting, addressing each tradeline individually.

71. Mr. Sicinski requested that any derogatory reporting be updated to ensure accuracy and completeness of the account as required by the FCRA.

72. Mr. Sicinski is informed and believes that Equifax and Experian each received Mr. Sicinski's Dispute Letters 1 and, in response, sent Mr. Sicinski's disputes to Dovenmuehle, as the data furnisher, via an ACDV through e-OSCAR.

73. On September 3, 2021, Mr. Sicinski ordered a second Equifax credit report and Experian credit report to ensure proper reporting by Mr. Sicinski's creditors (the "September 3 Credit Reports").

74. Mr. Sicinski noticed adverse tradelines in his September 3 Credit Reports, reporting inaccurate, misleading, or incomplete information that did not comply with the FCRA or credit reporting industry standards.

75. Mr. Sicinski then disputed the inaccurate tradeline regarding the accounts with Dovenmuehle via certified mail to Equifax and Experian on or about October 14, 2021 (the "Mr. Sicinski Dispute Letters 2").

76. Mr. Sicinski's Dispute Letters 2 additionally put Dovenmuehle on notice that, he has made all payments timely, and the account was not discharged in bankruptcy, but that his account was inaccurately and incompletely reflecting the payments made in the payment history, and inaccurately reported as discharged.

77. Mr. Sicinski's Dispute Letters 2 included the six (6) most recent months of mortgage payments to support his contention that the account was open (with the new servicer) and was in good standing as opposed to discharged.

78. Mr. Sicinski's Dispute Letters 2 also detailed what was perceived to be problematic about the Dovenmuehle account reporting, addressing each tradeline individually.

79. Mr. Sicinski requested that any derogatory reporting be updated to ensure accuracy and completeness of the account as required by the FCRA.

80. Mr. Sicinski is informed and believes that Equifax and Experian each received Mr. Sicinski's Dispute Letters 2 and, in response, sent Mr. Sicinski's disputes to Dovenmuehle, as the data furnisher, via an ACDV through e-OSCAR.

81. On November 22, 2021, Mr. Sicinski ordered a third Equifax credit report and Experian credit report to ensure proper reporting by Mr. Sicinski's creditors.

**F.     Mrs. Wingard's Credit Reports Contain Inaccurate Adverse Tradelines, which she Disputed to no Avail**

82. On February 9, 2021, Mrs. Wingard ordered an Experian credit report, an Equifax credit report, and a TransUnion credit report to ensure proper reporting by Mrs. Wingard's creditors (the "February 9 Credit Reports")[2].

83. Mrs. Wingard noticed adverse tradelines in her February 9 Credit Reports, reporting inaccurate, misleading, or incomplete information that did not comply with the FCRA or credit reporting industry standards.

84. Mrs. Wingard then disputed the inaccurate tradelines regarding the account with Dovenmuehle via certified mail to Equifax, Experian, and TransUnion on or about July 7, 2021 (the "Mrs. Wingard Dispute Letters 1").

---

[2] Although Mrs. Wingard obtained her Equifax credit report on February 9, 2021, it is dated January 25, 2021. For simplification, all three reports will be grouped and referenced as "February 9 Credit Reports".

85. Mrs. Wingard's Dispute Letters 1 specifically put Dovenmuehle on notice that, she has made all payments timely, and the account was not discharged in bankruptcy, but that her account was inaccurately and incompletely reflecting the payments made in the payment history, and inaccurately reported as discharged.

86. Mrs. Wingard's Dispute Letters 1 included the six (6) most recent months of mortgage payments to support her contention that the account was open (with the new servicer) and was in good standing as opposed to discharged.

87. Mrs. Wingard's Dispute Letters 1 also detailed what was perceived to be problematic about the Dovenmuehle account reporting, addressing each tradeline individually.

88. Mrs. Wingard requested that any derogatory reporting be updated to ensure accuracy and completeness of the account as required by the FCRA.

89. Mrs. Wingard is informed and believes that Equifax, Experian, and TransUnion each received Mrs. Wingard's Dispute Letters 1 and, in response, sent Mrs. Wingard's disputes to Dovenmuehle, as the data furnisher, via an ACDV through e-OSCAR.

90. On September 2, 2021, Mrs. Wingard ordered a second Experian credit report, an Equifax credit report, and a TransUnion credit report, to determine if the reporting on her account was updated.

    a. **Inaccuracy – Dovenmuehle**

91. Despite actual knowledge, Dovenmuehle continued to report Mr. Sicinski's account, beginning in 310144XXXXXXX, to Equifax with a payment status of "Included in Chapter 13".

92. Despite actual knowledge, Dovenmuehle continued to report Mr. Sicinski's account, beginning in 310144XXXXXXX, to Experian with inaccurate and incomplete payment history, a "BK" in the payment history for July of 2019, and with a payment status of "Debt included in or discharged through bankruptcy Chapter 13".

93. Despite actual knowledge, Dovenmuehle continued to report Mrs. Wingard's account, beginning in 310144XXXXXXX, to Equifax with a payment status of "Included in Chapter 13", and without any payment history.

94. Despite actual knowledge, Dovenmuehle continued to report Mrs. Wingard's account, beginning in 310144XXXXXXX, to Experian with an inaccurate and incomplete payment history, and with a payment status of "Debt included in or discharged through bankruptcy Chapter 13".

95. Reporting an account which has always been paid as agreed as if it was not paid is patently incorrect. Reporting no payment history or reporting a "D" for no data when payments have been made is patently incorrect. Reporting an account which was not discharged in bankruptcy as if it were, is patently incorrect. Further, reporting a "BK" in July of 2019 on Mr. Sicinski's Experian report is patently incorrect. In addition, these inaccurate and incomplete tradelines are misleading in a way that can adversely affect credit decisions.

96. Plaintiffs allege that Dovenmuehle did not investigate whether the account was provided for in the plan, exempt from discharge, or whether Plaintiffs had been making timely payments up until the transfer of the account.

97. On two separate occasions, Equifax and Experian each provided notice to Dovenmuehle that Mr. Sicinski was disputing the inaccurate and misleading information, but Dovenmuehle failed to conduct a reasonable investigation of the information as required by the Fair Credit Reporting Act.

98. Equifax, Experian, and TransUnion each provided notice to Dovenmuehle that Mrs. Wingard was disputing the inaccurate and misleading information, but Dovenmuehle failed to conduct a reasonable investigation of the information as required by the Fair Credit Reporting Act.

99. Based on Plaintiffs' combined seven disputes on the account, the provided payment verification, along with its own internal records, Dovenmuehle should have known that Plaintiffs' account was not discharged in their bankruptcy and that the payment history was reporting incorrectly and incompletely.

100. The most basic investigation would include a simple review of internal documentation on the account compared to its reporting in order to determine if it complies with the maximum possible accuracy and completeness standard of the FCRA.

101. Plaintiffs allege that Dovenmuehle did not review if its reporting complied with the FCRA or industry standards for credit reporting, the dispute letters it received from the CRAs, or its own internal records concerning the account.

102. If Dovenmuehle reviewed such standards and records, Dovenmuehle would have seen that its reporting was not in compliance and was therefore inaccurate or incomplete. At the very least, the investigation would reveal that payments were being made on the account, and therefore, those payments should be reported.

103. Dovenmuehle should have updated the account to show closed and transferred. Further, Dovenmuehle should have reported all the positive payments made on the account.

104. By continuing to report Plaintiffs' account as described herein, it incorrectly appears to third parties viewing Plaintiffs' credit reports that they stopped paying the account, have not made payments in years, and it was included and discharged in their bankruptcy.

105. Further, as this inaccurate reporting is being used to calculate Plaintiffs' respective Credit Scores, their Credit Scores alone being what most lenders use to determine Plaintiffs' creditworthiness, it is misleading in such a way as to adversely affect credit decisions.

106. Anything short of showing all of the positive payment history made on this account and showing the fact it was paid as agreed and transferred is patently incorrect and misleading to a credit reviewer.

107. A debt discharged is treated far more derogatorily by a potential lender than one which was paid as agreed and reflects a consumer's ability to timely make payments month after month, year after year. As payment history makes up thirty-five percent (35%) of a consumer's FICO Score, and as most lenders approve or deny credit based on a consumer's credit score (as opposed to poring through each tradeline of every account listed to obtain context), the incorrect payment history reported by Dovenmuehle is lowering Mr. Sicinski's and Mrs. Wingard's respective Credit Scores, which adversely affects their ability to obtain credit.

108. The lack of investigation and reporting of inaccurate and incomplete information by Dovenmuehle is unreasonable.

**G.    Damages**

109. Plaintiffs each pulled the credit reports at issue at a cost for access to the reports, after the dispute process, specifically for the sole purpose of verifying that the inaccuracies were fixed.

110. As a result of the incorrect reporting, Plaintiffs each have also suffered emotional harm, physical sickness, and excessive stress resulting in doubt as to the effectiveness of the Fair Credit Reporting Act and the power of this Court to preserve and perpetuate Plaintiffs' rights to accurate credit reporting as intended by Congress.

111. Mr. Sicinski is unable to rebuild his credit based on the inaccurate reporting by Defendants. Mr. Sicinski's diminished creditworthiness, resulting from Defendant's inaccurate reporting, has caused him to abandon his intentions to apply for certain credit.

112. Mrs. Wingard is unable to rebuild her credit based on the inaccurate reporting by Defendants. Mrs. Wingard's diminished creditworthiness, resulting from Defendant's inaccurate reporting, has caused her to abandon her intentions to apply for certain credit.

113. Dovenmuehle's actions, as alleged herein, are in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).

## FIRST CAUSE OF ACTION
### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681s-2(b))
### (Against Defendants and Does 1-100)

114. Plaintiffs re-allege and incorporate the allegations in each and every paragraph above by reference as if fully stated herein.

**A.  Dovenmuehle Failed to Reinvestigate Following Plaintiffs' Disputes**

115. Pursuant to 15 U.S.C. § 1681s-2(b), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

116. Dovenmuehle violated 15 U.S.C. § 1681s-2(b) by either failing to conduct an investigation or by failing to conduct a reasonable investigation and re-reporting misleading and inaccurate account information.

117. Dovenmuehle knew the mortgage payment horizon extended beyond the bankruptcy proceeds and that the payments were provided for in the Chapter 13 Plan. Dovenmuehle knew Plaintiffs always paid this account on time.

118. Despite receiving payments, Dovenmuehle would send an AUD to the CRAs reporting "D" for no data. This reporting is patently incorrect and misleading.

119. Despite receiving a payment in July 2019, Dovenmuehle sent an AUD to Experian reporting Mr. Sicinski's account with a "N" for negative. This reporting is patently incorrect and misleading.

120. After the bankruptcy was discharged, and Plaintiffs continued to pay on time, Dovenmuehle sold the mortgage to a new party. However, the AUD sent to the CRAs continued to report the account as discharged in bankruptcy and with incomplete and inaccurate payment history. This reporting is patently incorrect and misleading.

121. Equifax, Experian, and TransUnion each provided notice to Dovenmuehle that the Plaintiffs were disputing the inaccurate and misleading information; however, Dovenmuehle failed to conduct a reasonable investigation as required by the FCRA.

122. Based on the Plaintiffs' disputes, along with a review of its own internal records, Dovenmuehle should have known its account was paid on time as provided in the plan and was exempt from discharge. Further, Dovenmuehle should have reported the full payment history as it has actual knowledge of Plaintiffs' payments each month.

123. As Dovenmuehle has already decided to report the Plaintiffs' account, as evidenced by it showing up on their credit reports, once it received the Dispute Letters, it had a duty to review all relevant information, and update any incorrect or inaccurate information to each of the CRAs. Inaccurate information includes not only the information reported, such as reporting an account that was paid as agreed as discharged, but also for omissions that render the reported information misleading, such as reporting "N" or "D" when an actual payment was made.

124. Reporting an account which was paid on time and current at the time of transfer wholly without or with incomplete payment history is patently incorrect and misleading.

125. Reporting an account which was not discharged in bankruptcy as if it were discharged in bankruptcy is patently incorrect and misleading.

126. In addition, this inaccurate reporting also adversely affects credit decisions. Payment history, at thirty-five percent (35%), is the heaviest weighted factor that goes into calculating a Credit Score. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny credit or employment based upon the reported Credit Score and do not take the time to look through each tradeline of every account listed to obtain context. Therefore, Dovenmuehle's reporting as described herein has a direct adverse effect on

each Plaintiff's Credit Score and their ability to rebuild each of their Credit Scores and obtain new credit.

127. The lack of investigation by Dovenmuehle, as required by the FCRA, is unreasonable.

**B.     Willful Violations**

128. Plaintiffs allege that Dovenmuehle has reported based upon objectively unreasonable interpretations of the FCRA standards of credit reporting and regulatory guidelines on how to accurately report under the FCRA.

129. Plaintiffs further allege that Dovenmuehle has not properly trained those directly investigating disputes on FCRA requirements or credit reporting industry standards and, as such, has developed reckless policies and procedures.

130. Plaintiffs allege that rather than train their employees on accurate credit reporting, FCRA requirements, and industry standards, Dovenmuehle's employees tasked with reviewing disputes are expected to confirm the information being reported as "accurate" instead of investigating the reporting.

131. In the alternative, Dovenmuehle was negligent, which entitles the Plaintiffs each to recover under 15 U.S.C. § 1681o.

## PRAYER FOR RELIEF

132. WHEREFORE, Plaintiffs pray for judgment as follows:
   a. For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;
   b. Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;
   c. Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;
   d. Award attorneys' fees and costs of suit incurred herein pursuant to 15 U.S.C. §§ 1681n and 1681o;
   e. For determination by the Court that Defendant's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, *et seq*.; and

  f. For determination by the Court that Defendant's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

Respectfully submitted,

**SCHUMACHER LANE PLLC**

Dated: August 31, 2022

*/s/ Kyle Schumacher*
Kyle Schumacher
kyle@schumacherlane.com
P.O. Box 558
Spring Branch, TX 78070
503-482-8137 ph
210-783-1383 fax
Attorneys for Plaintiffs

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demands trial of this matter by jury.

**SCHUMACHER LANE PLLC**

Dated: August 31, 2022

*/s/ Kyle Schumacher*
Kyle Schumacher
Attorneys for Plaintiffs